**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Atta Ali, | No. CV-24-00905-PHX-SMM |
| Plaintiff, | **ORDER** |
| v. | |
| ASU Enterprise Partners, | |
| Defendant. | |

This matter is before the Court on Defendant's Motion for Summary Judgement. (Doc. 27). The Motion is fully briefed. (Docs. 27, 28, 31, 32, 35). The Court finds that the Motion is appropriate for resolution without oral argument. For the following reasons, the Court grants in-part and denies in-part Defendant's Motion.  (Doc. 27).

## I.    BACKGROUND

Plaintiff Atta Taha Ali ("Plaintiff" or "Mr. Ali") is a black male from Sudan, Africa. (Doc. 31 at 2). Mr. Ali worked for Defendant Arizona State University Enterprise Partners ("Defendant" or "ASUEP") from November 26, 2013, until May 26, 2022. (Id.) Mr. Ali was a Senior Reporting Analyst from 2013 to 2018 and was promoted to Data Warehouse Manager in 2018. (Id.); (Doc. 28 at 2). From 2013 until 2021, Mr. Ali received positive performance evaluations and received no formal discipline. (Id.); (Doc. 31 at 2).

Mr. Ali contends that he was subjected to on-going harassment and discrimination based on his race and national origin since 2018 that was allegedly manifested through

1    sabotage and racially offensive comments (i.e. "black hole") from his supervisor, Jay

2    Patel ("Mr. Patel"), and sabotage and nationally offensive comments (i.e. "you need to be

3    an American") from his former supervisor, Eric Conkle ("Mr. Conkle"). (Docs. 1, 27, 28,

4    31, 32). Mr. Ali also contends that he was terminated in retaliation for his complaints

5    against Mr. Conkle and Mr. Patel and believes that the performance improvement plan

6    ("PIP") was not warranted. (Ibid.)

7        **A. Alleged Discrimination and Retaliation from Eric Conkle**

8        Mr. Ali contends that beginning in 2018 he experienced discrimination from Mr.

9    Conkle. (Ibid.) During discussions about promotions, Mr. Conkle told Mr. Ali that he

10   "need[s] to be an American to move up." (Doc. 31 at 5); (Doc. 27 at 5). ASUEP claims

11   "that as a result of Federal Department of Homeland Security requirements, certain IT

12   services performed for ASUEP affiliate, ASU Research Enterprise ("ASURE"), must be

13   performed by U.S. citizens." (Id.) However, Mr. Ali interpreted the statement as

14   discriminatory. (Doc. 31 at 5).

15       Mr. Ali further alleges that in April 2020, Mr. Conkle falsely accused him of

16   "attacking" the server. (Doc. 27 at 3-4, 15). In Mr. Ali's internal complaint to ASUEP

17   Human Resources, he explained that he believed that Mr. Conkle purposefully sabotaged

18   his computer so it would not work correctly, make it appear that his computer was

19   "attacking" ASUEP's password server, and potentially set him up for criminal charges.

20   (Id.) On another occasion, Mr. Ali's remote server stopped working before he was about

21   to give a presentation. (Id. at 3). Mr. Conkle then did the presentation from his own

22   computer. (Id.) Mr. Ali alleges that Mr. Conkle acted in the background to prevent Mr.

23   Ali's programs from launching properly so Mr. Conkle could do the presentation himself

24   and take credit for his work. (Id.) Mr. Ali also alleges that Mr. Conkle caused the

25   Microsoft TEAMS system to make his status appear as "unknown" to other users. (Id.)

26       ASUEP hired an outside law firm and Valore Partners, a software engineering

27   company, to perform a forensic examination of their computers and systems to determine

28   whether there was any malfeasance or discrimination from Mr. Conkle. (Id.) The

investigating law firm and Valore Partners did not find any evidence to support Mr. Ali's claims. (Id.) However, Valore Partners concluded that due to a lack of available data, the root cause of each issue cannot be determined. (Doc. 28-2 at 1). Further, Mr. Ali contends that the investigations were biased because key witnesses were not interviewed, and the findings were presented without providing him an opportunity to review the underlying notes or offer rebuttal evidence. (Doc. 32 at 2).

Mr. Ali also contends that Mr. Conkle discriminatorily excluded him from training opportunities for certain projects and programs, specifically Workday and PowerBI. (Doc. 27 at 6). Mr. Conkle explained that he only provides certain training opportunities to employees who are directly involved in the projects at issue. (Id.) Mr. Conkle contends that because Mr. Ali was not directly involved in the Workday or PowerBI projects, he did not feel the need to include him in those trainings. (Id.) However, Mr. Ali had worked on PowerBI and Workday projects previously. (See Doc. 32).

Mr. Ali further claims that he was passed over for promotions because Mr. Conkle exerted his personal discriminatory influence over the decision-makers so they would not select him. (Doc. 32 at 4).

**B. Alleged Discrimination and Retaliation from Jay Patel**

In 2021, Mr. Patel became Mr. Ali's supervisor. (Doc. 28 at 6). Mr. Ali alleges that Mr. Patel continued removing him from important job responsibilities and projects. (Doc. 32 at 7). Mr. Patel contends that the reason he was removing Mr. Ali from some projects was because they were part of the "reporting team's responsibility." (Id.) Mr. Ali argues that this reason was pretextual as Mr. Patel kept at least some of the projects he stated were the reporting team's responsibility and began working on them himself, simply taking away the responsibility from Mr. Ali, without returning it to the reporting team and receiving the recognition that rightfully belonged to him. (Id.)

Additional examples of the discriminatory conduct Mr. Ali allegedly experienced include unnecessary public ridicule of his work performance during meetings and use of coded derogatory language, such as Mr. Patel calling Mr. Ali a "black hole." (Id.)

According to Mr. Ali, in a November 2021 meeting with the Data Engineering Team, Mr. Patel stated that "he has heard some people outside the office refer to us as the 'Black Hole.'" (<u>Id.</u>) Mr. Ali interpreted this as a racial trope specifically directed at him. (<u>Id.</u>) Further, in a subsequent daily data engineering team meeting on November 22, 2021, Mr. Ali contends that Mr. Patel accused him of not meeting performance expectations for missing a deadline when he was out sick and used the racial trope "Black Hole" again while talking about his work, and that Mr. Patel was upset and yelled at him in a manner that was insulting, derogatory and had a racial connotation to it. (Doc. 32-3 at 34-35). Then, on December 2, 2021, in the data governance bi-monthly meeting, with over 20 people from different departments, Mr. Patel said that some people call the team that works on the development metrics dashboard report ticket response time a "Black Hole." (<u>Id.</u>) Mr. Ali created the development metrics dashboard and maintained the report. (<u>Id.</u>)

Mr. Ali alleges that Mr. Patel repeated and spread the racial trope to ruin his work reputation, insult him, and spread rumors about him and his work product. (<u>Id. </u>at 35). Specifically, Mr. Ali alleges that the "Black Hole" comment "follows many inaccurate racial tropes that Black men are lazy and don't get things done." (<u>Id.</u>) Mr. Patel states that he said that people outside the office had been referring to the team as a "black hole" because whenever the Data Engineering Team took over a project, the project would stall and take a long time to complete, analogous to getting lost in a black hole. (Doc. 35 at 4).

On December 7, 2021, Mr. Ali again reported to human resources that he believed he was being subjected to discrimination based on his race, color, and national origin, but this time against Mr. Patel. (Doc. 32 at 3). In April 2022, Mr. Patel placed Mr. Ali on a PIP. (Doc. 28 at 8).

Mr. Patel allegedly creates Excel spreadsheets or logs for each employee, logs every negative incident, and tracks employees' progress over time. (Doc. 27 at 7). Around July 2021, Mr. Patel states that he noticed Mr. Ali's work performance increasingly began to suffer, as he was incurring negative occurrences at a noticeably higher rate than other employees based on his log. (<u>Id.</u>) Mr. Patel alleges that such

occurrences included missed deadlines, poor quality of work, poor attendance, and poor communication with other team members. (Id.) Thereafter, Mr. Patel allegedly sent Mr. Ali email reminders about upcoming deadlines and company expectations and provided Mr. Ali additional coaching. (Id.)

However, prior to being put on the PIP, Mr. Ali received positive performance evaluations. Some of the remarks included that he was "instrumental in defining, building, and eventually supporting the Data Factory pipelines;" that he provides a "tremendous" amount of support to his team, that he is often asked to develop "the most complicated reports" due to his expertise, that he has "consistently been a trailblazer on the team in exploring the reporting capability of Power BI," and that he is "a trusted resource that cares deeply about the quality of his work." (Doc. 32-2).

Mr. Ali argues that ASUEP relies on post-hoc rationales that are unsupported from the record, the log was created after he raised complaints of discrimination, the log was used selectively to manufacture a record justifying retaliation, and the log does not accurately reflect his performance. (Doc. 31 at 5). Further, Mr. Ali argues that ASUEP's own tool for logging employee performance and progressive discipline contains no evidence of prior warnings, coaching notes, or evaluation that signaled a performance trajectory that would culminate in termination. (Id.)

Additionally, Mr. Ali contends that Mr. Patel did not provide him clear direction, manipulated him, did not give him credit for his work, and hid the fact that he was still doing work for both the Data Engineering Team and the Reporting Team. (Id.) For example, the Sun Devil Athletic Department contacted Mr. Ali to run the athletics renewal report, which he had done for five or six years. (Id.) Then, Mr. Patel told Mr. Ali to not run the report because it is the reporting team's responsibility. (Id.) Later, Mr. Patel asked Mr. Ali to do the report. (Id.) But in Mr. Patel's log, he documented that Mr. Ali did not run the athletic renewal report adequately and in a timely fashion, even though Mr. Ali was out sick and did not have as much time to work on the report since Mr. Patel originally told him to not run the report. (Doc. 28-4); (Doc. 32-3).

On May 26, 2022, Mr. Ali received a letter that his employment with ASUEP is terminated immediately based on performance issues. (Doc. 28-1 at 8-9).

### C. Procedural Background

On February 3, 2023, Mr. Ali filed a Charge of Discrimination with the EEOC against ASUEP, claiming he had been subjected to discrimination based on national origin and race from January 1, 2018, to May 26, 2022, and that he was terminated in retaliation for reporting complaints in violation of Title VII. (Doc. 1). The EEOC gave Mr. Ali a right to sue letter. (Id.) Mr. Ali commenced this action on April 21, 2024. (Id.). On August 28, 2025, ASUEP filed the instant Motion for Summary Judgment. (Doc. 27). Mr. Ali filed a Response (Doc. 31) and ASUEP filed a Reply (Doc. 35).

## II.   LEGAL STANDARD

The purpose of summary judgment is "to isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010). "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine

issues for trial." <u>Id.</u> As the Ninth Circuit has said, "[t]his burden is not a light one." <u>Id.</u> To meet this burden, the "non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." <u>Id.</u> Additionally, parties opposing summary judgment are required to "cit[e] to particular parts of materials in the record" establishing a genuine dispute or "show[ ] that the materials cited do not establish the absence ... of a genuine dispute." Fed. R. Civ. P. 56(c)(1). A district court has no independent duty "to scour the record in search of a genuine issue of triable fact." <u>Keenan v. Allan</u>, 91 F.3d 1275, 1279 (9th Cir. 1996).

## III.    ANALYSIS

ASUEP moves for summary judgment on all of Mr. Ali's claims: (1) employment discrimination based on race or national origin, 42 U.S.C. § 2000e-2(a), and (2) retaliation for engaging in a protected activity, 42 U.S.C. § 2000e-3. (Docs. 1, 27).

### A. Discrimination Under 42 U.S.C. § 2000e-2(a)

Mr. Ali alleges racial and national origin discrimination under a disparate treatment theory and a hostile work environment harassment theory. (Doc. 1).

#### a.  Disparate Treatment Theory

Under Title VII an employer may not "discriminate against an individual with respect to his. . .terms, conditions, or privileges of employment" because of his race or national origin. 42 U.S.C. § 2000e-2(a). Title VII makes it unlawful for an employer "to fail to refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [his] compensation, terms, conditions, or privileges of employment" or "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" because of such individual's race or color. <u>Id.</u>

Disparate treatment claims require a plaintiff to prove that an employer acted with conscious intent to discriminate against a plaintiff based on his protected characteristic. <u>Costa v. Desert Palace</u>, 299 F.3d 838, 854 (9th Cir. 2002), <u>aff'd</u>, 539 U.S. 90 (2003). At

the summary judgment stage, a plaintiff need only make a prima facie case "established by proof of facts supporting an inference of intentional discrimination." Gay v. Waiters' & Dairy Lunchmen's Union, 694 F.2d 531, 538 (9th Cir. 1982). "The requisite degree of proof necessary to establish a prima facie case for Title VII. . .claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). This initial burden of production "is met upon a showing of actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such action was based upon race or another impermissible criterion." Gay, 694 F.2d at 538.

A party may evoke the burden-shifting McDonnell Douglas framework, which is "the traditional framework for evaluating disparate-treatment claims that rest on circumstantial evidence." Ames v. Ohio Dep't of Youth Servs., 605 U.S. 303, 306 (2025). Under the McDonnell Douglas framework, a plaintiff must establish: (1) the plaintiff belongs to a protected class; (2) the plaintiff was qualified for the position; (3) the plaintiff was subject to an adverse employment action; and (4) similarly situated individuals outside the plaintiff's protected class were treated more favorably. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). While a useful "tool to assist plaintiffs at the summary judgment stage so that they may reach trial, nothing compels the parties to invoke the McDonnell Douglas presumption." Costa, 299 F.3d at 855.

"Evidence can be in the form of the McDonnell Douglas prima facie case, or other sufficient evidence—direct or circumstantial—of discriminatory intent." Costa, 299 F.3d at 855. "[T]he court must make a sensitive inquiry into the direct and circumstantial evidence of discrimination offered by the plaintiff in order to determine if the facts so proved allow a legally-permissible inference of discriminatory intent." Gay, 694 F.2d at 538. Direct evidence establishing a prima facie case, "if believed, proves the fact [of discriminatory animus] without inference or presumption." Vasquez v. Cnty. of Los

1    <u>Angeles</u>, 349 F.3d 634, 640 (9th Cir. 2006). Circumstantial evidence, on the other hand,

2    requires a fact finder to draw inferences or presumptions of discriminatory intent, such as

3    putting "forward specific and substantial evidence challenging the credibility of the

4    employer's motives." <u>Id.</u> at 642.

5          If the plaintiff establishes a prima facie case, the burden shifts to the defendant

6    who must articulate legitimate, non-discriminatory reasons for the challenged action.

7    <u>McDonnell Douglas</u>, 411 U.S. at 802. If the defendant meets this burden, the plaintiff

8    must finally show that the "reason is pretextual either directly by persuading the court

9    that a discriminatory reason more likely motivated the employer or indirectly by showing

10   that the employer's proffered explanation is unworthy of credence." <u>Davis v. Team Elec.</u>

11   <u>Co.</u>, 520 F.3d 1080, 1089 (9th Cir. 2008) (internal citation and quotations omitted)).

12         Finally, if the plaintiff can show pretext, then the <u>McDonnell Douglas</u> framework

13   "disappear[s]," and "the sole remaining issue [i]s 'discrimination vel non.'" <u>Reeves v.</u>

14   <u>Sanderson Plumbing Products</u>, 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105

15   (2000). A plaintiff may simply produce direct or circumstantial evidence demonstrating

16   that a discriminatory reason "more likely than not motivated" the employer. <u>Metoyer v.</u>

17   <u>Chassman</u>, 504 F.3d 919, 931 (9th Cir. 2007) (citation omitted); <u>see</u> <u>also</u> <u>Hawn v. Exec.</u>

18   <u>Jet Mgmt., Inc.</u>, 615 F.3d 1151, 1155 (9th Cir. 2010) (explaining that a plaintiff may

19   show an inference of discrimination "through comparison to similarly situated

20   individuals, or any other circumstances surrounding the adverse employment action [that]

21   give rise to an inference of discrimination") (internal quotation marks and citation

22   omitted). Moreover, "very little evidence" is required "to survive summary judgment in a

23   discrimination case, because the ultimate question is one that can only be resolved

24   through a searching inquiry—one that is most appropriately conducted by the factfinder,

25   upon a full record." <u>Schnidrig v. Columbia Mach.</u>, Inc., 80 F.3d 1406, 1410 (9th Cir.

26   1996) (internal quotation marks and citation omitted).

27                          **1. McDonnell Douglas Framework**

28         In this case, both parties both invoke the <u>McDonnell Douglas</u> framework. (<u>See</u>

Docs. 27, 31). Therefore, Mr. Ali must first establish a prima facie case of racial or national origin discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 802. Mr. Ali must establish that (1) he belongs to a protected class, (2) he was performing according to his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. <u>Id.</u>; <u>see</u> <u>also</u> <u>Hawn</u>, 615 F.3d at 1156.

ASUEP concedes that Mr. Ali has established the first and third elements of his prima facie case. (Doc. 27 at 10). However, ASUEP argues that Mr. Ali fails to satisfy the second and fourth elements because it had a legitimate, nondiscriminatory reason for terminating Mr. Ali, similarly situated employees were not treated more favorably, Mr. Ali has not shown evidence of pretext, and Mr. Ali's failure to promote claim is time barred. (<u>Id.</u> at 10-14). In response, Mr. Ali argues that he was performing to ASUEP's legitimate expectations and that there is evidence of pretext. (Doc. 31 at 4-6).

### i. Mr. Ali's Performance at AFCU

Mr. Ali argues that he establishes the second element of his prima facie case because for nearly a decade he consistently received positive evaluations reflecting his ability to meet and exceed ASUEP's expectations. (<u>Id.</u> at 4). Some of the feedback Mr. Ali received in his performance evaluations include that he was "instrumental in defining, building, and eventually supporting the Data Factory pipelines;" that he provides a "tremendous" amount of support to his team, that he his often asked to develop "the most complicated reports" due to his expertise, that he has "consistently been a trailblazer on the team in exploring the reporting capability of Power BI," and that he is "a trusted resource that cares deeply about the quality of his work." (Doc. 32-2).

Despite Mr. Ali's overwhelmingly positive performance evaluations, ASUEP contends that Mr. Ali's performance fell below its expectations. (Doc. 27 at 11-12). ASUEP argues that from July 2021 through May 2022, Mr. Patel noted seventy (70) different instances in his manager tracking spreadsheet or log where Mr. Ali failed to

1  meet company expectations. (<u>Id.</u> at 10). During this time, Mr. Ali received multiple poor

2  performance reviews from Mr. Patel. (<u>Id.</u>) In April 2022, Mr. Patel put Mr. Ali on a PIP

3  notifying Mr. Ali of ASUEP's expectations and warning Mr. Ali that failure to improve

4  could lead to termination. (<u>Id.</u>) About a month after the PIP was issued, ASUEP

5  terminated Mr. Ali immediately for failing to improve his performance. (<u>Id.</u>)

6       Mr. Ali argues that ASUEP relies on post-hoc rationales that are unsupported from

7  the record, the log was created after he raised complaints of discrimination, the log was

8  used selectively to manufacture a record justifying retaliation, and the log does not

9  accurately reflect his performance. (Doc. 31 at 5). Further, Mr. Ali argues that ASUEP's

10 own tool for logging employee performance and progressive discipline contains no

11 evidence of prior warnings, coaching notes, or evaluation that signaled a performance

12 trajectory that would culminate in termination. (<u>Id.</u>)

13      Upon the Court's review of Mr. Patel's log, the Court finds that the stated non-

14 discriminatory reasons are likely illegitimate. Thus, ASUEP's stated no-discriminatory

15 reasons are not enough to demonstrate that Mr. Ali's performance was so poor that it

16 warranted termination. Throughout the log, Mr. Patel complains that Mr. Ali is not timely

17 acknowledging or responding to emails, and that Mr. Ali is not completing his assigned

18 tasks quick enough. (Doc. 28-4). Then, Mr. Patel jumps to the conclusion that because

19 Mr. Ali missed some deadlines, he therefore lacks the skills to solve technical problems

20 independently and lacks the basic skills necessary for the role. (<u>Id.</u>) Also, some of the

21 other issues that Mr. Patel notes include that Mr. Ali did not enter his sick time or

22 vacation time in Workday, did not put an out-of-office message when he was sick, that he

23 "request[ed] the day off on the very day he wants to take off." (<u>Id.</u>) The Court finds that

24 Mr. Patel's entries in his log are either trivial or appear to be manufactured excuses for

25 terminating Mr. Ali.

26      Also, an employees' "self-assessment of his performance is relevant" to determine

27 if a plaintiff "has met his minimal prima facie burden of establishing that he was

28 qualified" for his position. <u>Aragon v. Republic Silver State Disposal Inc.</u>, 292 F.3d 654,

660 (9th Cir. 2002), <u>as amended</u> (July 18, 2002). Mr. Ali contends that he was performing satisfactorily in his position. (Doc. 31 at 4). For example, Mr. Ali developed the metrics dashboard report and athletics renewal form report, including the first Power BI dashboard. (Doc. 32-3). Mr. Ali states that "[b]oth projects are very complex technical projects and solutions that [he] spent a significant amount of time and effort to develop, automate and streamline complex processes and tasks, which have saved the end users a significant amount of time and manual effort to accomplish these tasks and saved ASU Foundation this money on overhead costs." (<u>Id.</u>)

Additionally, Mr. Ali contends that Mr. Patel did not provide him clear direction, manipulated him, did not give him credit for his work, and hid the fact that he was still doing work for both the Data Engineering Team and the Reporting Team. (<u>Id.</u>) For example, the Sun Devil Athletic Department contacted Mr. Ali to run the athletics renewal report, which he had done for five or six years. (<u>Id.</u>) Then, Mr. Patel told Mr. Ali to not run the report because it was the reporting team's responsibility. (<u>Id.</u>) Later, Mr. Patel asked Mr. Ali to do the report. (<u>Id.</u>) But in Mr. Patel's log, he documented that Mr. Ali did not run the athletic renewal report adequately and in a timely fashion, even though Mr. Ali was out sick and did not have as much time to work on the report since Mr. Patel originally told him to not run the report. (Doc. 28-4); (Doc. 32-3). Accordingly, the Courts finds that there is sufficient evidence to demonstrate that Mr. Ali was likely performing adequately in his position and that Mr. Ali satisfies the second element of his prima facie case.

## ii.    Evidence of Pretext

ASUEP argues that Mr. Ali cannot establish the fourth element of his prima facie case because (1) he produced no evidence of similarly situated employees to show a link between his protected statuses and his termination and that (2) he has not offered sufficient circumstantial evidence to create an issue of fact as to whether his protected statuses motivated ASUEP's decision to terminate his employment. (Doc. 27 at 11). The Court agrees with ASUEP that there is no evidence in the record of similarly situated

1   employees being treated more favorably in this precise manner. However, the court

2   disagrees with ASUEP that there is not enough circumstantial evidence sufficient to give

3   rise to an inference of discrimination.

4       In evaluating motions for summary judgment in the context of employment

5   discrimination, the Ninth Circuit emphasizes that district courts should zealously guard

6   an employee's right to a trial, since "discrimination claims are frequently difficult to

7   prove without a full airing of the evidence and an opportunity to evaluate the credibility

8   of the witnesses." McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1112 (9th Cir. 2004);

9   see, e.g., Schnidrig, 80 F.3d at 1410–11. As the Supreme Court has stated, "[t]he real

10  social impact of workplace behavior often depends on a constellation of surrounding

11  circumstances, expectations, and relationships which are not fully captured by a simple

12  recitation of the words used or the physical acts performed." Oncale v. Sundowner

13  Offshore Serv., Inc., 523 U.S. 75, 81–82 (1998). "As a result, when a court too readily

14  grants summary judgment, it runs the risk of providing a protective shield for

15  discriminatory behavior that our society has determined must be extirpated." McGinest,

16  360 F.3d at 1112.

17      Mr. Ali alleges that Mr. Conkle sabotaged his computer, influenced others to not

18  select him for a promotion, and excluded him from training opportunities. (Doc. 32 at 2).

19  And, according to Mr. Ali, Mr. Conkle and Mr. Patel subjected him to derogatory

20  language, exclusionary conduct, and retaliatory scrutiny that took a psychological toll on

21  him. (Id.)

22      Specifically, Mr. Ali alleges that on November 22, 2021 in the daily data

23  engineering team meeting Mr. Patel accused him of not meeting performance

24  expectations for missing a deadline when he was out sick and used the racial trope "Black

25  Hole" while talking about his work, and that Mr. Patel was upset and yelled at him in a

26  manner that was insulting, derogatory and had a racial connotation to it. (Doc. 32-3 at 34-

27  35).

28      Mr. Ali also alleges that on December 2, 2021, in the data governance bi-monthly

meeting, with over 20 people from different departments, Mr. Patel was talking about the development metrics dashboard report ticket response time and stated that "some call it the 'Black Hole.'". (Id.) Mr. Ali created the development metrics dashboard and maintained the report. (Id.) Mr. Ali believes that Mr. Patel repeated and spread the racial trope to ruin his work reputation, insult him, and spread rumors about him and his work product. (Id. at 35). Mr. Ali also believes that the "black hole" comment is insulting, derogatory and has a racial connotation to it because it "follows many inaccurate racial tropes that Black men are lazy and don't get things done." (Id.)

ASUEP argues that Mr. Ali's interpretation of Mr. Patel's use of the term "black hole" does not give rise to a viable claim. (Doc. 27 at 15-16). ASUEP argues that the term "black hole" could not have referred to the color of his skin because Cambridge Dictionary defines "black hole" as "an imaginary place in which things are lost" so no reasonable juror could conclude Mr. Patel's reference to "black hole" was intended to be hostile.[1] (Id. at 15).

To support that argument, ASUEP relies on Sanchez v. City of Santa Ana, where the Ninth Circuit upheld the district judge's directed verdict that "no reasonable jury could have found a hostile work environment despite allegations that the employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and kept illegal personnel files on plaintiffs because they were Latino." Vasquez, 349 F.3d at 643 (citing Sanchez, 636 F.2d 1027, 1031, 1036 (9th Cir. 1990)); (Doc. 35 at 7). However, in Sanchez, the Ninth Circuit decided on procedural grounds "whether the district court erred in deciding the issue without hearing from the defense" and did not decide the merits of the claim itself. 632 F.2d at 1037; Fed. R. Civ. P. 41(b).

The Ninth Circuit has also held that "[r]acially motivated comments or actions may appear innocent or only mildly offensive to one who is not a member of the targeted

---

[1] https://dictionary.cambridge.org/us/dictionary/english/black-hole

1    group, but in reality be intolerably abusive or threatening when understood from the
2    perspective of a plaintiff who is a member of the targeted group." <u>McGinest</u>, 360 F.3d at
3    1116. "The omnipresence of race-based attitudes and experiences in the lives of black
4    Americans [may cause] even nonviolent events to be interpreted as degrading,
5    threatening, and offensive." <u>Id.</u> (citation omitted). "Title VII tolerates no racial
6    discrimination, subtle or otherwise." <u>McDonnell Douglas Corp.</u>, 411 U.S. at 801. The
7    Court must consider "both the existence and the severity of discrimination from the
8    perspective of a reasonable person of the plaintiff's race", including forms of
9    discrimination that "may be overlooked if considered solely from the perspective of an
10   adjudicator belonging to a different group than the plaintiff." <u>McGinest</u>, 360 F.3d at
11   1116.

12        In <u>McGinest</u>, the Ninth Circuit held that the use of coded language to refer to race,
13   such as calling an African American employee a "drug dealer," can violate Title VII. <u>See</u>
14   <u>id.</u> at 1116–17 (citation omitted). The <u>McGinest</u> court concluded that the reference to the
15   plaintiff as a "drug dealer" "might certainly be deemed to be a code word or phrase. In
16   fact, reported cases have recognized the racial motivations behind this and other
17   comments and slurs experienced by [the plaintiff]." <u>Id.</u> at 1117 (collecting cases). It
18   follows that Mr. Patel's language regarding Mr. Ali being a "black hole" could constitute
19   similarly coded language and is appropriate for jury consideration.

20        Also, it is undisputed that Mr. Conkle told Mr. Ali that he needs "to be an
21   American" to be promoted. (Doc. 31 at 5); (Doc. 27 at 5). ASUEP claims "that as a result
22   of Federal Department of Homeland Security requirements, certain IT services performed
23   for ASUEP affiliate, ASU Research Enterprise ("ASURE"), must be performed by U.S.
24   citizens." (<u>Id.</u>) However, ASUEP does not cite which regulation it is referencing, nor
25   does it provide the Court a copy of the regulation, so the Court cannot determine the
26   accuracy of ASUEP's stated non-discriminatory reason. Mr. Ali perceived the comment
27   as nationally charged and discriminatory. Therefore, there is a genuine dispute of material
28   fact whether Mr. Conkle was nationally hostile in his statements to Mr. Ali.

Further, contrary to ASUEP's characterization, Mr. Ali's evidence does not exist solely of his own self-serving statements. (Doc. 27 at 15). Mr. Ali's perception of the events that transpired go to whether he is credible, a determination that is exclusively within the province of the factfinder at trial, not the district court on summary judgment:

> [A]t this stage of the litigation, the judge does not weigh disputed evidence with respect to a disputed material fact. **Nor does the judge make credibility determinations** with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions. These determinations are within the province of the factfinder at trial.

T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987) (emphasis added) (citations omitted); see also McGinest, 360 F.3d at 1113 n. 5 ("[I]t is axiomatic that disputes about material facts and credibility determinations must be resolved at trial, not on summary judgment.").

The issue of an employer's motivations is one more appropriately left for a jury. Miller, 797 F.2d at 732–33. "[I]n discrimination cases, an employer's true motivations are particularly difficult to ascertain, thereby making such factual determinations generally unsuitable for disposition at the summary judgment stage." Id. Accordingly, Mr. Ali has produced enough evidence that ASUEP's reasons for the written warnings and termination were merely pretext for a discriminatory motive. See Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000); see also Costa, 299 F.3d at 853–54; see also Dominguez-Curry v. Nevada Transp. Dep't, 424 F.3d 1027, 1042 (9th Cir. 2005)[2]. Therefore, the Court denies ASUEP's Motion for Summary Judgment on Count I on Mr. Ali's discrimination claim under a disparate treatment theory. (Doc. 27).

### 2. Failure to Promote

The Court agrees with ASUEP that Mr. Ali's failure to promote claim regarding Mr. Patel's position is time barred. (Doc. 27 at 12-13); (Doc. 35 at 5); 42 U.S.C. § 2000e-

---

[2] Also, this Court previously held that a plaintiff survived summary judgment in a Title VII case where the defendant alleged that the plaintiff missed numerous deadlines, produced poor work quality, refused to follow orders, required more supervision than other employees, and did not get along with co-workers. Spina v. Maricopa Cnty. Dep't of Transp., No. CV050712PHX SMM, 2010 WL 457507 (D. Ariz. Feb. 5, 2010).

5(e) (establishing 180- and 300-day periods for filing EEOC charges); <u>Sommatino v.</u> <u>United States</u>, 255 F.3d 704, 707-08 (9th Cir. 2001) ("In order to bring a Title VII claim in district court, a plaintiff must first exhaust her administrative remedies."). ASEUEP hired Mr. Patel in May 2021, and Mr. Ali filed his EEOC Charge on February 3, 2023, making him late by over a year. (Doc. 35 at 5); <u>see</u> <u>Nat'l R.R. Passenger Corp v. Morgan</u>, 536 U.S. 101, 115 (2002). Further, Mr. Ali failed to address this issue in his Response (<u>See</u> Doc. 31) and therefore concedes that his claim is time barred. (Doc. 35 at 5); <u>see</u> LRCiv 7.2(i). Thus, the Court grants ASUEP's motion on Mr. Ali's failure to promote claim regarding Mr. Patel's position.

**B. Hostile Work Environment Theory**

Mr. Ali describes numerous events and practices, which he alleges cumulatively created a hostile work environment. (Doc. 31 at 7-8). These events fall into two categories: some involved allegedly discriminatory treatment through concrete actions, while others involved oral derogatory statements.

Title VII's prohibition of discrimination against any individual with respect to her employment "includes the prohibition against the creation of a hostile work environment." <u>Reynaga v. Roseburg Forest Prods.</u>, 847 F.3d 678, 686 (9th Cir. 2017); <u>see</u> <u>also</u> <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (quoting <u>Meritor Sav. Bank, FSB</u> <u>v. Vinson</u>, 477 U.S. 57, 65, 67 (1986)) ("When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." (citations omitted)).

To succeed on a hostile work environment claim based on race, the plaintiff must demonstrate: "(1) that he was subjected to verbal or physical conduct of a racial. . . nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." <u>Reynaga</u>, 847 F.3d at 686 (quoting <u>Vasquez</u>, 349 F.3d at 642.

In assessing whether a work environment is sufficiently hostile, the court examines the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998) (quoting Harris, 510 U.S. at 23). "The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 872 (9th Cir. 2001) (internal quotation marks and citation omitted).

"[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" are not sufficient to create an actionable claim under Title VII, but the harassment need not be so severe as to cause diagnosed psychological injury. Faragher, 524 U.S. at 788 (internal quotation marks and citation omitted); see also Harris, 510 U.S. at 22. It is enough "if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay in her position." Steiner, 25 F.3d at 1463. Such hostility need not be directly targeted at the plaintiff to be relevant to his or her hostile work environment claim. McGinest, 360 F.3d at 1117.

A plaintiff must show that the work environment was both subjectively and objectively hostile. Nichols, 256 F.3d at 871–72. It is undisputed that Mr. Ali subjectively perceived his workplace to be hostile, as evidenced by his repeated complaints about Mr. Conkle and Mr. Patel. As to the objective inquiry, the Court assesses whether the workplace was hostile from the perspective of a reasonable person belonging to the plaintiff's racial or ethnic group. McGinest, 360 F.3d at 1115.

As previously stated, the use of coded language to refer to race, such as a "black hole," may create a hostile work environment and violate Title VII. See id. at 1116–17. Also, as explained above, the fact that Mr. Patel used the phrase "black hole" on numerous occasions, including in meetings with multiple departments in reference to Mr. Ali and his team, Mr. Patel's increasing micromanagement, and the fact that Mr. Conkle

1    and Mr. Patel's behavior allegedly made it more difficult for Mr. Ali to complete his

2    work provides additional evidence as to the severity of the conduct that is better suited

3    for a jury's determination. (Docs. 27, 28, 30, 35); see Reynaga, 847 F.3d at 686.

4        Accordingly, there is a dispute of material fact whether the alleged demeaning

5    language, discriminatory conduct, and scrutiny inflicted on Mr. Ali were sufficiently

6    severe or pervasive to create a hostile work environment under the objective inquiry.

7    Thus, the Court denies ASUEP's Motion for Summary Judgment on Mr. Ali's

8    discrimination claim under a hostile work environment harassment theory. (Doc. 27).

9        **C. Retaliation**

10       To prove a Title VII retaliation claim, Mr. Ali must show that "(1) he engaged in a

11   protected activity; (2) [ASUEP] subjected him to an adverse employment action; and (3)

12   a causal link exists between the protected activity and the adverse action." Ray, 217 F.3d

13   at 1240. At the summary judgment stage, a plaintiff need not prove the elements of a

14   retaliation claim by a preponderance of the evidence. Yartzoff v. Thomas, 809 F.2d 1371,

15   1375 (9th Cir. 1987). Rather, "to make out a prima facie case, a plaintiff need only make

16   a minimal threshold showing of retaliation." Emeldi v. Univ. of Oregon, 673 F.3d 1218

17   (9th Cir. 2012).

18       If a plaintiff makes out a prima facie case of retaliation, the court proceeds to

19   apply the burden-shifting framework set forth in McDonnell Douglas. See 411 U.S. at

20   802–04; see also Stegall v. Citadel Broad. Co., 350 F.3d 1061, 1066 (9th Cir. 2003).

21   Under the McDonnell Douglas framework, the burden shifts to the defendant "to

22   articulate a legitimate, nondiscriminatory reason for the adverse employment action."

23   Manatt v. Bank of Am., N.A., 339 F.3d 792, 800 (9th Cir. 2003). "If the defendant

24   articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the

25   reason was merely a pretext for a discriminatory motive." Ray, 217 F.3d at 1240; see also

26   McDonnell Douglas, 411 U.S. at 802. "Proof of a causal link between [Plaintiff's]

27   complaint and his termination—as evidenced by temporal proximity—is certainly

28   relevant to an evaluation of pretext. Reynaga at 694. Further, "[i]n some cases, temporal

proximity can by itself constitute sufficient circumstantial evidence of retaliation for purposes of both the prima facie case and the showing of pretext." <u>Dawson v. Entek Int'l</u>, 630 F.3d 928, 937 (9th Cir. 2011).

ASUEP concedes that Mr. Ali has satisfied the first two elements of a Title VII retaliation claim because (1) Mr. Ali engaged in protected activity, and (2) Mr. Ali was subjected to an adverse employment action. (Doc. 27 at 13). However, ASUEP argues that Mr. Ali cannot meet the third element because Mr. Ali cannot show a causal link between the protected activity and the adverse employment action. (<u>Id.</u> at 13-14).

Specifically, ASUEP argues that Mr. Ali cannot demonstrate causation by relying on a December 2021 internal complaint as the basis for his discharge five months later. (<u>Id.</u>) In response, Mr. Ali argues that the adverse employment actions began just weeks after he filed his December 2021 complaint, there is no evidence of documented performance concerns before his December 2021 complaint, and there was no documented performance improvement plan before his December 2021 complaint.

ASUEP cites <u>Clark Cnty. Sch. Dist. v. Breeden</u> to support its argument that Mr. Ali cannot demonstrate an inference of causation based on temporal proximity. 532 U.S. 268, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001); (Doc. 27 at 13). However, in <u>Clark Cnty. Sch. Dist. v. Breeden</u> there was "no indication that [the supervisor] even knew about the right-to-sue letter" and the plaintiff relied on *only* temporal proximity to support the retaliation claim. <u>Id.</u> at 273, 1511. In contrast, ASUEP knew of his complaint, and Mr. Ali does not rely on only temporal proximity to support his claim. (Doc. 31 at 6-7).

Mr. Ali contends that the record establishes that in the months immediately following his December 2021 internal complaint and March 2022 EEOC complaint, his working conditions materially worsened. (<u>Id.</u> at 6). For example, Mr. Ali was placed under increased scrutiny from Mr. Patel, denied meaningful assignments, stripped of leadership functions, and was placed on a PIP that directly preceded his termination. (<u>Id.</u>) Mr. Ali argues that this sequence of events creates a close temporal nexus between protected activity and adverse action to support an inference of retaliatory intent. (<u>Id.</u> at

7); see Yartzoff, 809 F.2d at 1376 ("Proximity in time is apparent on the record: the transfers of job duties and the sub-average performance rating all occurred during the pendency of the administrative complaints and investigations. This inference of a causal link is strengthened by the closeness in time between particular events.").

Here, like Yartzoff, ASUEP's adverse actions against Mr. Ali began just weeks after his first protected report, there was no evidence of documented performance concerns prior to these reports, and there was no documented performance improvement plan until after Mr. Ali filed the protected reports. (Doc. 31 at 7). For example, in Mr. Ali's 2021 performance evaluation from Mr. Patel, Mr. Ali received positive feedback and there was no indication that Mr. Ali was performing below ASUEP's expectations. (Doc. 32-2 at 9-14).

Additionally, ASUEP argues that any temporal proximity argument is undercut by the intervening event that Mr. Ali failed to meet the PIP goals. (Doc. 27 at 14). However, at the pretext stage, a plaintiff's burden is low, and "very little[ ] evidence is necessary to raise a genuine issue of fact regarding an employer's motive." Opara v. Yellen, 57 F.4th 709, 723-24 (9th Cir. 2023) (quoting McGinest, 360 F.3d at 1124). "Nevertheless, a plaintiff must present some evidence that goes to the defendant's motivation—either by directly showing that it was discriminatory or by contesting the defendant's claimed motivation." Kama v. Mayorkas, 107 F.4th 1054, 1059 (9th Cir. 2024) (citing Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1063 (9th Cir. 2002)); see also Reeves, 530 U.S. at 148 ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may [be enough]."). If there is "abundant and uncontroverted independent evidence" supporting the defendant's stated motive, then "plaintiff's 'creat[ion of] only a weak issue of fact as to whether the employer's reason was untrue' will not suffice." Opara, 57 F.4th at 724 (quoting Reeves, 530 U.S. at 148).

Mr. Ali contends that Mr. Patel's manager log did not accurately reflect his performance, that the log was created after he raised complaints of discrimination and was used selectively to manufacture a record justifying retaliation. (Doc. 31 at 5, 7). Mr.

Ali further alleges that Mr. Patel did not maintain similar logs of other employees and began the documentation shortly after Mr. Ali engaged in protected activity. (Id.) As the Court explained above, there is sufficient evidence to demonstrate that Mr. Ali was likely performing adequately in his position and that the log was likely a manufactured excuse to justify Mr. Ali's termination.

Mr. Ali's evidence as to how he was treated during his employment, the timing of Mr. Patel's increasing micromanagement after the December 2021 internal complaint, the lack of evidence of performance issues for over eight years before Mr. Patel became Mr. Ali's supervisor, and Mr. Ali's termination a few months after his written complaint is sufficient to establish a genuine dispute of fact as to whether ASUEP's proffered reason for terminating Mr. Ali's employment is pretextual. Therefore, the Court denies ASUEP's Motion for Summary Judgment on Mr. Ali's retaliation claim. (Doc. 27).

## IV.    CONCLUSION

For the preceding reasons, the Court grants in-part and denies in-part ASUEP's Motion for Summary Judgment. (Doc. 27). The Court grants ASUEP's Motion on Mr. Ali's failure to promote claim. However, the Court denies the rest of ASUEP's Motion because there remain genuine disputes of material facts whether ASUEP's proffered reasons for Mr. Ali's termination are pretextual.

For the reasons set forth,

**IT IS ORDERED granting in-part and denying in-part** Defendant's Motion for Summary Judgment. (Doc. 27). Summary judgment is awarded to Defendant on Plaintiff's failure to promote claim. The Court denies summary judgment on Plaintiff's remaining claims.

Dated this 9th day of January, 2026.


Stephen M. McNamee
Senior United States District Judge